In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

Nos. 15-1834, 15-3874, 16-1303

S.A.B.,

*Petitioner*,

*v.*

DANA J. BOENTE, Acting Attorney General of the United States,

*Respondent*.

———————————

Petitions for Review of Orders of the Board of Immigration Appeals, No. A000-000-000, and of U.S. Citizenship and Immigration Services, a component of the Department of Homeland Security.

———————————

ARGUED JANUARY 4, 2017 — DECIDED FEBRUARY 2, 2017

———————————

Before POSNER, EASTERBROOK, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. We introduce this immigration case by noting that Jane's is a long-established British publisher of studies, often book-length, of (so far as relates to this case) warfare, weaponry, national security, electronic warfare, insurgency, terrorism, and related topics. See

"Jane's Information Group," *Wikipedia*, https://en.wik ipedia.org/wiki/Jane%27s_Information_Group (visited Feb. 1, 2017, as were the other websites cited in this opinion). In 2006 and 2011 Jane's issued two confidential reports on the Oromo Liberation Front (OLF), which the reports describe as having become "the most robust armed group in Ethiopia in the late 1990s." See JANE'S WORLD INSURGENCY AND TERROR- ISM, *Oromo Liberation Front (OLF)* 1 (March 23, 2011) (we'll call it "*Jane's Report* (2011)"); JANE'S WORLD INSURGENCY AND TERRORISM, *Oromo Liberation Front (OLF)* 1 (May 31, 2006) ("*Jane's Report* (2006)").

Though the Oromo are the largest ethnic group in Ethio- pia, they consider themselves discriminated against by the Ethiopian government, which is the reason or a reason that the OLF would like to see the government overthrown. *Jane's Report* (2006) states at pages 2 and 4 that the OLF, founded in the early 1970s, has long conducted a "low level guerrilla campaign against the Ethiopian security forces," in part from bases that it has established in countries neighbor- ing Ethiopia, such as Kenya and Somalia. The 2011 report states at pages 1–3 that between 1973 and 2011 the OLF wreaked considerable havoc that included a number of kill- ings of Ethiopian security personnel, though it had not come close to overthrowing the government. The immigration judge in this case classified the OLF as a "Tier III" terrorist organization, defined in 8 U.S.C. § 1182(a)(3)(B)(vi)(III) as "a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in," ter- rorist activity as defined in subsection iv of the above sec- tion.

The petitioner is a former member of the OLF now living in the United States. Her name is not SAB, though that is the name that appears in the briefs; those are her initials; she or her lawyers are concerned that should her name appear in the briefs in this court or in our opinion, she or a member of her family, such as her sister, who had been imprisoned by the Ethiopian government possibly in an attempt to discover SAB's whereabouts after she'd fled the country, might become a target of the Ethiopian government. We'll refer to her by her initials rather than her name, but it would be unrealistic to think they actually conceal her identity; for the opinions of the Immigration Court and the Board of Immigration Appeals use her full name rather than her initials to identify her, and those opinions are public documents.

An Ethiopian citizen now 61 years old, SAB came to the United States in 2004 on a visitor's visa that expired in December of that year. But rather than leave the United States she applied for asylum and alternatively for withholding of removal. When an asylum officer deemed her claims not credible, the Department of Homeland Security charged her in the Immigration Court with being "removable" (deportable) for having remained in the United States after the expiration of her visa, and therefore illegally. See 8 U.S.C. § 1227(a)(1)(B). She conceded removability, and the immigration judge designated Ethiopia as the country to which she would be removed. But she renewed her application for asylum and her alternative application for withholding of removal, basing both grounds for relief on fear that if removed to Ethiopia she would be tortured by the Ethiopian government because of her past membership (which she acknowledges) in the OLF.

An Oromo, she had joined the OLF in 2001, three years before she came to the United States. She had attended the general meetings of the OLF in 2002 and 2003 and made small financial contributions to the organization, though as we'll note shortly she had helped the organization in other ways as well. In 2002 she'd seen reports on television that the OLF had killed people, but she claims not to have believed the reports because the television station was owned by the Ethiopian government. Subsequently her husband disappeared (and has never reappeared and may well be dead) and she was arrested and imprisoned for four months and, though never tried or sentenced, was tortured in prison.

Her principal witness at her removal hearing was Dr. Charles Schaefer, a history professor at Valparaiso University in Indiana. He specializes in Ethiopian politics, having been born in Ethiopia and lived there for a number of years. He testified that while some bombings and other violent acts have been attributed to the OLF he thinks it unclear whether it rather than some other political group was actually responsible for them. Though aware of Jane's reports he thinks them "biased, market-driven and shoddily verified," but he provided no evidence to support these suspicions. He contests, again without evidence, statements in our State Department's country reports that the OLF "regularly use[s] landmines." See U.S. Dep't of State, Bureau of Democracy, Human Rights, and Labor, *Ethiopia Country Reports on Human Rights Practices 2001* (March 4, 2002), www.state.gov/j/drl/rls/hrrpt/2001/af/8372.htm; U.S. Dep't of State, Bureau of Democracy, Human Rights, and Labor, *Ethiopia Country Reports on Human Rights Practices 2002* (March 31, 2003), https://www.state.gov/j/drl/rls/hrrpt/2002/18203.htm.

He testified that he would expect SAB to "assume that the OLF is a non-violent organization, first and foremost [because] … the OLF was a vehicle by which she could validate her Oromo identity." We don't understand the logic of that sentence; if belonging to the OLF validates an Oromo's identity, it does so whether the OLF is violent or peaceful. And finally he testified that he thought SAB would be imprisoned by the Ethiopian government if she returned to Ethiopia.

The immigration judge ruled that while SAB is entitled to deferral of removal under the Convention Against Torture because (according to Schaefer's and other evidence) she indeed risks torture if returned to Ethiopia, owing to the Ethiopian government's continued fierce hostility to the OLF, she is not entitled to either asylum or withholding of removal. That's because she admits having been a member of the OLF and having "provided material support to the OLF," a terrorist organization, when she solicited and donated funds to it, paid monthly dues, and recruited other Oromo women to join her OLF chapter. She further admits having heard television and radio reports in 2002 that the OLF was responsible for violent attacks. She would have understood those reports, as she is a relatively sophisticated person: a high school graduate who (more important) owned a business in Ethiopia and engaged in extensive international travel in support of the business.

After the Board of Immigration Appeals affirmed the immigration judge and SAB appealed to us, she asked a component of the Department of Homeland Security usually referred to as USCIS (short for U.S. Citizenship and Immigration Services) to lift the terrorism bar that prevented her

from obtaining asylum or withholding of removal. USCIS refused.

As noted below, knowing support of a terrorist organization is a bar to asylum or withholding of removal. On the basis of the U.S. State Department country reports, Jane's reports, and other reputable information sources such as Human Rights Watch (conceded by Dr. Schaefer to be a credible source) and START (Study of Terrorism and Responses to Terrorism), and noting that Dr. Schaefer had no evidence that the OLF had *not* engaged in violence during the period in which SAB was a member, the immigration judge had enough evidence to conclude that the OLF had committed a number of violent acts, killing a significant number of people, over a period of years that included the years in which SAB was a member.

But was SAB a terrorist by virtue either of her membership in the OLF or of her having provided "material support" to it? See 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd). Obviously she did provide material support: she donated money to the OLF, recruited women to join it, and helped in fundraising. Her support of the group was not major, but minor material support is still material support within the meaning of the statute. See *Hussain v. Mukasey*, 518 F.3d 534, 538 (7th Cir. 2008).

Although a person who belongs to or provides material support to a terrorist organization is presumed to know it is indeed a terrorist organization, there is an escape hatch if the alien can "demonstrate by clear and convincing evidence that [he or she] did not know," and "should not reasonably have known [in other words, shouldn't have been expected to know], that the organization was a terrorist organization."

8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd). SAB failed to meet that standard (especially the second half), because among other things the OLF claimed responsibility for a bombing that killed 14 people in 2002, when SAB was living in Addis Ababa (the capital of Ethiopia) with ready access to radio and television. Indeed there were numerous reports of OLF violence between 2001 and 2004 (see, e.g., Nita Bhalla, "Ethiopia Links Blast to Oromo Rebels," BBC, October 2, 2002, http://news.bbc.co.uk/2/hi/africa/2293185.stm; "OLF Claims Responsibility for Bomb Blast," IRIN, June 26, 2002, http://www.irinnews.org/news/2002/06/26/olf-claims-respon sibility-bomb-blast), including some from the OLF's official channel—the "Voice of Oromo Liberation."

SAB, solidly middle class, a business woman, could not have missed all these reports or reasonably thought all of them fraudulent. Clearly she didn't provide "clear and convincing evidence" that she had missed or disbelieved all of them.

So the immigration judge found (and the Board of Immigration Appeals affirmed his finding) that SAB knowingly supported a terrorist organization to which she belonged, and this finding, the soundness of which we have no basis for doubting, bars her from obtaining asylum in the United States, see 8 U.S.C. § 1227(a)(4)(B)—that is, makes her deportable despite the immigration judge's also impeccable finding that she is likely to be imprisoned and quite possibly tortured if returned to Ethiopia, given that before leaving for the United States she had been imprisoned and tortured in prison because of her affiliation with the OLF, which continues to be the Ethiopian government's *bête noir*. We must therefore deny the first petition for review that SAB filed in

this case, which seeks asylum and withholding of removal. The reader should bear in mind however that the removal order, which is predicated on her being a member of a terrorist organization, can't be executed as long she remains under threat of torture if returned to Ethiopia. See 8 C.F.R. § 1208.17.

SAB has filed two other petitions for review. One asks us to overrule the decision by USCIS not to lift the terrorism bar. The other challenges the refusal of the Board of Immigration Appeals to set aside the removal order. USCIS is authorized to lift the bar for an individual or a Tier III terrorist group, subject to exceptions inapplicable to SAB. See 8 U.S.C. § 1182(d)(3)(B)(i). And if it had lifted the bar, thereby cutting the link between SAB and OLF, she would be eligible for asylum and withholding of removal. But UCSIS declined to lift the bar, and the statutory provision that we just cited grants the agency "sole unreviewable discretion" whether to do so. With the bar thus fixed in place, there is no basis for our vacating the removal order. The petition is therefore dismissed.

SAB's third petition for review challenges the BIA's decision to deny her motion to reopen. The Board denied the motion as untimely and found no reason to reopen it *sua sponte*. We have jurisdiction to review a denial of a motion to reopen; such review is consolidated with our review of the final order of removal. See 8 U.S.C. § 1252(a)(1), (b)(6). But we find no error in the Board's refusal to reconsider its order of removal in light of USCIS's decision, because remember that USCIS's "sole unreviewable discretion" precludes the Board's reopening the proceeding. We therefore deny the

third petition along with the first; the second we dismiss for want of jurisdiction.

And so, to conclude, SAB's petition for review of her final order of removal is denied, as is her petition for review that challenges the BIA's decision to deny her motion to reopen. Her remaining petition is dismissed for want of jurisdiction to review USCIS's discretionary rulings.